UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOVEREIGN GENERAL INSURANCE SERVICES, INC., a California corporation,<br><br>    Plaintiff,<br><br>  v.<br><br>SCOTTSDALE INSURANCE COMPANY, an Ohio corporation, NATIONAL CASUALTY COMPANY, a Wisconsin corporation, SCOTTSDALE INDEMNITY COMPANY, an Ohio corporation, WESTERN HERITAGE INSURANCE COMPANY, an Arizona corporation, R. MAX WILLIAMSON, an individual, JOSEPH A. LUGHES, an individual, and DOES 1 through 100, inclusive,<br><br>    Defendants. | No. 2:05-cv-0312-MCE-DAD<br><br>Consolidated with<br>2:05-cv-1389-MCE-DAD<br><br>**MEMORANDUM AND ORDER** |

----oo0oo----

///

///

///

///

///

1

Dockets.Justia.com

This consolidated litigation arises from the termination of agency agreements between Sovereign General Insurance Services, Inc. ("SGI"), a surplus line broker, and four insurance companies, Scottsdale Insurance Company and its subsidiaries, Scottsdale Indemnity Company, National Casualty Company and Western Heritage (hereinafter collectively referred to as "Scottsdale" unless otherwise noted). SGI's initial lawsuit (2:05-cv-1312-MCE-DAD), the lead case herein, alleges that Scottsdale improperly deprived SGI of contingent commissions and loss of prospective business in terminating its agreements. Scottsdale subsidiary Western Heritage then proceeded to file its own action (2:05-cv-1389-MCE-DAD) contending that SGI wrongfully failed to remit insurance premiums due Western Heritage. SGI's Amended Counterclaim and Cross-Claim in that action (hereinafter referred to as the "Counterclaim") presents allegations similar, albeit in more detail, to that alleged in SGI's case-in-chief. Hence, in now moving for summary adjudication, or alternatively for summary adjudication as to certain claims, SGI has structured its motion around the Counterclaim but seeks the same relief as to both consolidated actions.

///
///
///
///
///
///
///
///

**BACKGROUND**

In 1995, SGI entered into general agency and profit-sharing agreements with the Scottsdale entities pursuant to which SGI placed insurance business written by Scottsdale.[1]  Those agreements uniformly provided for termination, with or without cause, upon thirty (30) days written notice by any party. (Scottsdale's Undisputed Fact ("UF") Nos. 1, 4, 13, 15).  In the event of termination, the profit-sharing component of the agreements provided that no further contingent commissions (based on underwriting profitability) would be earned or due until outstanding liabilities, including loss reserves, had been satisfied on business placed by SGI.  (UF Nos. 6, 17).

With respect to Western Heritage, but not the other Scottsdale entities, SGI further had certain renewal rights concerning the use and control of policy "expirations".  As long as all premium amounts payable for business written with Western Heritage had been remitted, the Western Heritage Agency Agreement provided that the "use and control of expirations would remain the property" of SGI.  (See Western Heritage Agreement, Ex. 31 to Decl. of Anthony J. Barron, ¶ 7.1).[2]

///
///

---

[1] SGI's agreement with Western Heritage was effective July 10, 1995; it later entered into separate agreements collectively with the other Scottsdale entities on August 14, 1995.

[2] While SGI argues that the language of the Agreement should apply only to premium amounts actually collected, ¶ 4.1 makes it clear that whenever a policy is issued, "a premium will be deemed to be payable".

1    In addition to the agency agreements as discussed above, SGI
2 also itself purchased, beginning in 1998, a series of errors and
3 omissions policies from one of the Scottsdale subsidiaries,
4 National Casualty, to satisfy contractual obligations imposed by
5 Scottsdale that required such coverage.  (UF No. 20).  After a
6 claim was made against that policy in 2001, National Casualty
7 filed a declaratory relief action seeking judicial determination
8 as to whether it owed any duty to defend or indemnify SGI on that
9 claim.  According to Scottsdale's counsel, on June 21, 2004,
10 during the trial of that coverage action, SGI's Chairman and
11 Chief Executive Officer, Martin F. Sullivan, sent a letter to the
12 California Insurance Wholesaler's Association complaining about
13 the National Casualty policy and the treatment his company
14 received after making the above-referenced claim.  (Scottsdale's
15 Moving Points and Authorities, 4:18-26).[3]  Thereafter, on June 28,
16 2004, in response to this public criticism from its agent,
17 Scottsdale provided written notice to SGI that it was terminating
18 its agreements with SGI effective August 1, 2004.  (Id. at 4:27-
19 5:3, see Barron Decl., Exs. 7, 8).

    Scottsdale has produced uncontroverted evidence that
outstanding liabilities on SGI's business in effect at the time
it terminated SGI's agreements had still not been satisfied more
than two years post termination.

///
///

---

[3] While Scottsdale did not attach a copy of this letter to its Motion, SGI has not disputed Scottsdale's recitation of its contents.

4

(Decl. of Shannon M. Aughe, ¶¶ 4-5; Decl. Of Lawrence J. Genalo, Jr., ¶¶ 4-5).[4] Consequently, the Scottsdale entities argue that any additional contingent commissions remain unpayable under the terms of the agreements. Moreover, with respect to SGI's renewal rights to policy expirations on its Western Heritage business, Western Heritage has shown that premium amounts have continued to remain unpaid. Therefore it contends that any renewal rights also remain unvested. SGI's President, Fred Godinez, admitted at his deposition that premiums due to Western Heritage at the time of termination had not been paid. (Godinez Dep., 60:25-61:4, Ex. B to the Barron Decl.). SGI does not dispute Western Heritage's contention that all premiums had not been accounted for at that time. (UF No. 10). As of April 30, 2006, nearly two years later, SGI still owed some $756,582.89 in unpaid premiums according to Western Heritage records. (Aughe Decl., ¶ 12). When SGI President Godinez was deposed in June of 2006, he admitted that SGI still had not paid some $180,000.00 in premiums even though he apparently did not believe that Western Heritage's estimate as enumerated above remained correct. (Godinez Dep., June 19, 2006, 25:26:22; 31:14-22, Ex. C to the Barron Decl.).

///
///
///
///

---

[4] Although SGI purports to raise a triable issue of fact in this regard with respect to Scottsdale's Undisputed Fact Nos. 7 and 18, the evidence cited refers not to outstanding liabilities but instead to uncollected premiums. (Decl. of Fred Godinez, ¶ 10).

5

Kathy Brignolio, an SGI employee whose duties include determining the amount of premiums still owing to Western Heritage, also confirmed that as of June 2006 she had not yet "caught up" on verifying open items and remitting premium payments to Western Heritage. (Brignolio Dep., 144:15-145:12; 146:24-147:15, Ex. A to Barron Reply Decl.).

In now moving for summary judgment, Scottsdale contends that because its actions were consistent with the terms of its agreements with SGI, it cannot be liable for claims premised either on breach of contract or upon other wrongful conduct like interference with prospective advantage. In addition, with respect to SGI's fraud claim, Scottsdale asserts that SGI has not identified any misrepresentation giving rise to an actionable claim in that regard. SGI, on the other hand, claims that material issues of fact preclude summary judgment because Scottsdale owed, but did not pay, profit sharing commissions due SGI on June 30, 2004, prior to the August 1, 2004 date of effective termination. SGI also maintains that termination was improper in the first place on grounds that Scottsdale intended to wrongfully deprive SGI of its renewal ownership rights on a highly lucrative book of business that SGI had carefully cultivated and maintained.

///
///
///
///
///
///

6

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Rule 56 also allows a court to grant summary adjudication on part of a claim or defense. *See* Fed. R. Civ. P. 56(a) ("A party seeking to recover upon a claim ... may ... move ... for a summary judgment in the party's favor upon all or any part thereof."); *see also* Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995); France Stone Co., Inc. v. Charter Township of Monroe, 790 F. Supp. 707, 710 (E.D. Mich. 1992).

The standard that applies to a motion for summary adjudication is the same as that which applies to a motion for summary judgment. See Fed. R. Civ. P. 56(a), 56(c); Mora v. ChemTronics, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party. U.S. v. Diebold, Inc., 369 U.S. 654, 655 (1962).

///
///
///

Once the moving party meets the requirements of Rule 56 by showing that there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). Genuine factual issues must exist that "can be resolved only by a finder of fact, because they may reasonably be resolved in favor of either party." Id. at 250. In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. *See* T.W. Elec. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630-631 (9th Cir. 1987), citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

**ANALYSIS**

**1.   Claims Premised on Contractual Breach.**

As enumerated above, it is undisputed that SGI's agreements with Scottsdale are "at-will" in that they allow for termination with or without cause upon thirty (30) days notice. Termination of an at-will contract cannot normally form the basis of either breach of contract or the corresponding tort of breach of the covenant of good faith and fair dealing, which depends upon an underlying contractual breach. See EPIS, Inc. v. Fid. & Guar. Life Ins. Co., 156 F. Supp. 2d 1116, 1125-1128 (N.D. Cal. 2001).
///
///

The parties agree that Arizona law applies in issues pertaining to the interpretation and enforcement of the agreements at issue, given choice of law provisions to that effect contained within said agreements. (See Barron Decl., Ex. 31, ¶ 12.14; Ex. 4, ¶ X(K). Arizona law upholds the validity of at-will termination rights absent some public policy violation like race or gender discrimination. See Consumers Int'l, Inc. v. Sysco Corp. 951 P.2d 897, 902-03 (Ariz. Ct. App. 1997). Here, in an attempt to invoke the public policy concerns necessary to vitiate the import of at-will provisions, SGI argues that its termination by Western Heritage[5] was wrongful because it was effectuated in order "to deprive SGI of its contractual and statutory rights to ownership of the renewals of policies it had placed ... prior to termination." (Opp'n, 1:16-19). SGI's argument fails.

First, with respect to SGI's claimed contractual rights, those rights are of course spelled out by the terms of the agency agreements between the parties. As stated above, the Western Heritage Agency Agreement provides that the use and control of policy expirations shall remain SGI's property, as long as all premiums and other monies belonging to Western Heritage have been paid by SGI:

> "If, upon termination of this Agreement, the 'General Agent' has promptly accounted for and paid to the 'Company' all 'premiums' and other monies .... collected or held for or on behalf of the 'Company' .... the records of the 'General Agent" and the use and control of expirations shall remain the property of the 'General Agent' and be left in his undisturbed possession ..."

---

[5] SGI makes no argument that termination was wrongful with respect to any of the other Scottsdale defendants.

9

(See Western Heritage Agreement, Ex. 31 to Barron Decl., ¶ 7.1).

Here, because it is undisputed that SGI has still not paid all the premiums due to Western Heritage on the policies it produced, under the express terms of the agreement SGI has no unequivocal right to expirations upon which a breach of contract can lie. Indeed, the only argument advanced by SGI to avoid that conclusion rests with its assertion that because "[t]he contractual exclusion for the ownership right applies only to premium received and held". (Opp'n, 8:8-10). SGI hence argues that as long as it remitted all premiums it received, it could assert its expiration rights even if additional premiums remained unpaid and owing. That interpretation of contractual language at issue, however, is flatly contradicted by ¶ 4.2 of the Western Heritage Agency Agreement, which states clearly that premiums are "deemed to be payable" *whenever* a policy is issued.[6] (Western Heritage General Agency Agreement, Ex. 31 to the Barron Decl., ¶ 4.2).

Having disposed of the contractual component to SGI's contention that Western Heritage wrongfully terminated its agency agreement so as to deprive it of policy expiration rights, we now turn to SGI's asserted statutory grounds for avoiding the import of the agreement's at-will provisions. In that regard, SGI points to the provisions of California Insurance Code § 769(d), which provides in pertinent part as follows:

---

[6]SGI has not argued that any of its unpaid premium falls within the only exception to this rule of thumb recognized by the Agreement, situations wherein policies were returned within thirty (30) days and resulted in no liability to Western Heritage. Id.

10

> "if a terminated broker-agent is unable, after making a good faith effort, to place existing policies with another insurer, the insurer then insuring the risk shall, at the broker-agent's request, renew any insurance contract written by the broker-agent for the insurer for one policy term or a period of one year, whichever is shorter."

According to SGI, Western Heritage has violated § 769(d) by converting the renewals and placing them with other agents. SGI claims that this claimed statutory violation implicates public policy and hence permits it to avoid the strictures of at-will termination. SGI is wrong.

First, as stated above, the Western Heritage agreement contains Arizona choice-of-law provisions. Arizona law makes it clear that to the extent a statutory violation encompasses public policy concerns, the statute in question must be an Arizona statute. Wagenseller v. Scottsdale Mem. Hosp., 710 P.2d 1025, 1034 (Ariz. 1985) (in assessing whether a public policy violation has occurred "we will look to the pronouncements of *our* founders, *our* legislature, and *our* courts to discern the public policy of *this* state" (emphasis added)). While SGI argues that California law should apply because SGI is licensed as a broker in California, and because Western Heritage is an approved non-admitted surplus line carrier within California, the fact remains that both parties agreed to be bound by Arizona law in construction and enforcement of their mutual agreement. Having made that agreement, SGI cannot now step forward and demand that a contractual provision with respect to expiration rights, which SGI admittedly has not satisfied, be utilized to create rights it otherwise would not possess.

///

11

1    Moreover, even were § 769(d) be relevant in assessing the
2 scope of SGI's expiration rights, which the Court believes it is
3 not, the statute still is of no avail to SGI under the
4 circumstances of this case.  Subdivision (e) of the statute
5 provides that renewal is not required in certain instances,
6 including when "the broker-agent has failed.... within 10 days
7 after written demand upon failure to remit funds within the time
8 limits set forth in the agency or brokerage contract.... to remit
9 funds due and owing to the insurer."  Cal. Ins. Code §
10 769(e)(1)(C).  The Western Heritage agreement provides that
11 premiums are due whenever a policy is issued, with the balance
12 owed to be paid not later than forty-five (45) days after the end
13 of the month on which the account in question appears.
14 (Agreement, Ex. 31 to the Barron Decl., ¶¶ 4.1 and 4.2).  Here,
15 SGI did not pay despite what it itself acknowledged were repeated
16 demands for premium payment by Western Heritage.  (Brignolio
17 Dep., 139:9-140:3; Ex. A to the Barron Reply Decl.).
18 Consequently SGI cannot rely on the savings provisions of § 769
19 in any event.

20    In addition, the terms of § 769(d) require on their face a
21 terminated agent-broker like SGI to specifically request an
22 extension of renewals, after itself making a good-faith effort to
23 successfully place the business in question elsewhere, in order
24 to claim protection under the statute.  The only request alleged
25 to comply with § 769 that has been identified by SGI is a July
26 27, 2004 letter to Scottsdale from SGI's attorneys.  (Godinez
27 Decl., ¶ 7).
28 ///

Examination of that letter, however, as attached to Scottsdale's Reply, states only that "it is anticipated that SGI will be required to avail itself of the protections granted [by § 769] after making a good faith effort to replace coverage with another carrier pursuant to subsection (h)(2)." (See Ex. A to Decl. of Todd J. Miller, p. 2). This statement of potential need in the future, however, which by its terms depends upon SGI's attempts to place policies elsewhere, falls short of an unequivocal request in the present triggering protection under the statute.

The only other contractual breach identified by SGI in its Opposition to this motion concerns its claim that a contingent commission payment was due and owing to SGI on June 30, 2004, prior to the August 1, 2004 effective date of termination. SGI maintains that that payment should have been made even if other payments were, under the provisions of the agency agreements, held in abeyance until all outstanding liabilities and claims against the policies in question had been fully resolved. SGI's claim in that regard, however, suffers from the fact that SGI admits it owed the Scottsdale entities unpaid premium in July of 2004, prior to the effective date of agency termination on August 1, 2004. (Brignolio Depo., 71:5-9). SGI had also apparently not responded to open item recap requests made in April, May, and June of 2004 prior to notice of termination. (Id. at 139:9-140:3).

///
///
///
///

The Western Heritage Agreement provides plainly that the right of any agent to receive commission payments "shall at all times be subordinate to the right of the 'Company' to offset or apply 'Commissions' against any indebtedness of the 'General Agent' to the 'Company'. (Agreement, Ex. 31 to the Barron Decl., ¶ 4.6). This means that SGI cannot claim entitlement to interim commission payments if it owed funds, including premium payments, to Western Heritage. Western Heritage has shown that as of June 30, 2004, when a contingent commission payment was due, SGI owed at least $806,404.80 in premiums for new policies and renewal as demonstrated by an open items summary report. (Aughe Reply Decl., ¶ 4; Ex. 27). As stated above, SGI has still not resolved all those outstanding items. As of June 2006, Western Heritage has estimated that SGI still owes in excess of $750,000.00, and while SGI disputes the entirety of that amount, its President, Fred Godinez, admitted at his deposition that even in his estimation some $180,000.00 was still due. By Western Heritage's calculations, the contingent commission that would have been owed SGI on June 30, 2004 was some $62,262.00 (See Godinez Decl., Ex. A). Even if that amount should have been higher, as SGI claims, there still appears to be no dispute that SGI owed more to Western Heritage than it was due in contingent commissions as of June 30, 2004. Hence, given the offset rights accorded to Western Heritage under the terms of its agency agreement, it did not owe any payment to SGI as of June 30, 2004. Hence there can be no breach of contract in failing to remit owed contingent commissions as SGI contends.

///

Given the above, Western Heritage has rebutted any claim that it breached the terms of its agency agreement with SGI. Significantly, SGI does not even identify any actionable breaches as to the other Scottsdale entities giving rise to contractual claims. Hence Scottsdale is entitled to summary adjudication as to the First, Second, Third and Fourth Claims in SGI's Amended Counterclaim for Breach of Contract and Breach of the Covenant of Fair Dealing as to Western Heritage and the other Scottsdale entities, respectively.[7]

**2.  Interference with Prospective Economic Advantage and Accounting Claims.**

SGI does not take issue with Scottsdale's assertion that Arizona law, which as stated above governs the agency agreements defining the parties' respective rights and obligations, follows the Restatement of Torts formulation regarding interference with prospective economic advantage:

> Except as stated in Section 698 [betrothal promises], one who, without a privilege to do so, induces or otherwise purposely causes a third person not to (a) perform a contract with another, or (b) enter into or continue a business relation with another is liable to the other for the harm caused thereby.

---

[7] Although R. Max Williamson, Chief Operating Officer of Scottsdale Insurance, Scottsdale Indemnity, and National and Casualty, and Joseph A. Lughes, President of Western Heritage, are also named as individual defendants in the implied covenant claims, Scottsdale argues that no contractual liability as to either individual has been identified apart from their roles on behalf of the corporate entities, which as set forth above are not actionable. SGI has not refuted that contention, and indeed makes no argument whatsoever that either Williamson are Lughes committed any independent contractually based breaches for which they could incur liability for either breach of contract or breach of the implied covenant of good faith and fair dealing.

15

Restatement of Torts § 766; see <u>Pre-Fit Door v. Dor-Ways, Inc.</u>, 477 P.2d 447, 559-560 (Ariz. Ct. App. 2001).

Irrespective of whether Arizona or California law applies, both jurisdictions require a plaintiff asserting an interference claim to prove that the asserted interference was wrongful or improper. See <u>Strojnik v. Gen'l Ins. Co. of Am.</u>, 36 P.3d 1200, 1202 (Ariz Ct. App. 2001) (referring to the need to demonstrate "the impropriety of [the] interference"); <u>Della Penna v. Toyota Motor Sales, U.S.A., Inc.</u>, 11 Cal. 4th 376, 392 (1995) (wrongfulness need be shown "by some other measure beyond the fact of interference itself").

Here, SGI asserts claims for both negligent and intentional interference. With respect to the negligence based claim, SGI does not dispute Scottsdale's claim that Arizona law does not recognize negligent interference with prospective economic advantage as a tort. See. e.g., <u>Southwest Pet Prods. v. Koch Indus., Inc.</u>, 89 F. Supp. 2d 1115, 1131 (D. Ariz. 2000); <u>Edwards v. Anaconda Co.</u>, 565 P.2d 190, 192 (Ariz. Ct. App. 1977). Moreover, and in any event, the only allegedly improper conduct giving rise to interference in the first place is, according to SGI, "the wrongfulness of the termination as a pretext to deprive SGI of contractual rights to contingent commissions and ownership of renewals" (Opp'n, 8:13-15). As demonstrated above, however, SGI has not shown that the termination of its agency agreements was either wrongful or at odds with the contractual provisions contained within said agreements. Consequently, just as no contractually based claims have been shown, so have no interference claims been established.

Similarly, SGI's counterclaim for an accounting depends upon the validity of its claims for additional contingent commissions and/or policy expiration rights for which an accounting would be required. Since SGI has not established its entitlement to any additional monies upon which an accounting could be necessary, SGI's accounting claim necessarily fails.

**5.   Fraud.**

SGI's final claim alleges fraud on behalf of all the Scottsdale Defendants, as well as individual defendants Williamson and Lughes, in inducing it to purchase an errors and omissions policy from National Casualty that would provide professional liability coverage for SGI's role as a wholesaler, general agent, and surplus line broker. According to the Amended Counterclaim, Scottsdale's representations as to the scope of coverage "were false and knowingly made," with SGI relying on such falsehoods to its detriment in purchasing the policy. (Amended Counterclaim, ¶¶ 115-17).

SGI's factual basis in alleging fraud stems from its presentation to National National Casualty of a claim made against SGI by Lloyd's of London. SGI claims that a subsequent declaratory relief action designed to ascertain whether coverage existed for the claim was "without basis and designed to prevent SGI from enjoyng the benefit of its E&O policy regarding the Lloyd's claim." (Opp'n, 8:17-18).

///
///

17

Although the agency agreements between Scottsdale and SGI have been interpreted and enforced in accordance with Arizona law by virtue of the choice-of-law provisions contained in those agreements, SGI's fraud allegations call for the application of California law since they involve sale of an insurance policy, by a carrier admitted to transact business in California, to a California insured (SGI).

In order to state a viable fraud claim under California law, SGI must show 1) a misrepresentation; 2) made with knowledge of its falsity; 3) made with the intent to defraud (i.e., to induce reliance); 4) upon which SGI reasonably relied; 5) resulting in damage to SGI.  Cal. Civ. Code § 1709.

SGI cannot claim that it was induced to purchase a "worthless" policy since the National Casualty policy at issue ultimately provided and paid the contracted-for coverage.  At most, as indicated above, SGI's fraud claim would appear to revolve an accusation that Scottsdale made a misrepresentation as to whether a claim would be covered without resort to a declaratory relief action to determine coverage.  SGI's Chief Executive Officer, Martin F. Sullivan, who is undisputedly an experienced industry professional (UF No. 25), could, however, identify nothing he was told by anyone associated with issuance of the policy that he ultimately determined was untrue. (Sullivan Dep., 201:6-10, Ex. D to the Barron Decl.).

///
///
///
///

18

SGI has not put forth any evidence, for example, that it was told that no declaratory action would ever be filed in order to assess the propriety of coverage, and such an argument would belie credibility had it in fact been advanced, particularly for an insurance agency like SGI familiar with the mechanics of claims processing.

SGI has not proffered an actionable misrepresentation, let alone a misrepresentation made with knowledge of its falsity and with intent to induce reliance on SGI's part in purchasing the National Casualty policy. That fundamental shortcoming dooms the viability of SGI's fraud claim, and compels a conclusion that summary adjudication on such claim be granted.

**CONCLUSION**

For all the foregoing reasons, summary judgment is GRANTED in favor of both the Scottsdale entities, as well as the individually named Defendants, on all claims asserted by SGI in these consolidated proceedings.[8]

IT IS SO ORDERED.

Dated: February 16, 2007

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE

---

[8] Because oral argument will not be of material assistance, the Court orders this matter submitted on the briefs. E.D. Cal. Local Rule 78-230(h).